UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                                    CASE NO. 8:20-cr-84-T-23SPF

ADAM LEE HOLLIS

### UNITED STATES' SENTENCING MEMORANDUM

The United States files this sentencing memorandum requesting that this Court sentence the defendant, Adam Lee Hollis, to a guidelines sentence of 60 years' imprisonment. In support thereof, the United States submits as follows:

### I.        Background

In June 2011, Hollis married J.H. Final Presentence Investigation Report (PSR), ¶ 77. He eventually cohabitated with J.H. and her prepubescent minor relatives, K.T. and S.T. In January 2013, Hollis, a convicted sex offender, created child-pornographic photographs of K.T., a seven-year-old child in his custody and care. Doc. 37 at 25. He later advertised and traded the images with other individuals who shared a sexual interest in children. Doc. 37 at 24. The investigation further revealed that Hollis sexually abused S.T., an eight-year-old child also in his custody and care. PSR ¶ 63. Additionally, he amassed a child pornography collection consisting of at least 252 images and 88 videos. *See* PSR ¶ 25.

In 2013, Hollis pleaded guilty to state charges for sexually battering K.T. PSR ¶ 60. He received a 20-year sentence and is expected to be released in 2031. PSR ¶ 60. The state later charged Hollis for sexual battery and showing obscene material

to S.T., but ultimately dropped those charges. PSR ¶ 63. Due in part to the extraordinary danger that Hollis poses to the community, the United States applied for and received a waiver to prosecute Hollis for crimes related to his 2013 sexual battery conviction. *See* PSR ¶ 60.

In February 2020, a federal grand jury charged Hollis with having produced child pornography (Counts One and Two), having transported child pornography (Counts Three and Five), having received child pornography (Count Four), having possessed child pornography (Count Six), and having produced child pornography while being required to register as a sex offender (Count Seven). Doc. 1. In November 2020, Hollis pleaded guilty by plea agreement to Counts One and Seven. Docs. 37, 43. Hollis's sentencing hearing is set for February 17, 2021. Doc. 43.

## II.        Presentence Investigation Report

On February 4, 2021, the U.S. Probation Office issued its Final Presentence Investigation Report. Doc. 46. The Probation Officer determined that Hollis's applicable guideline range for Count One is 600 months' imprisonment and a mandatory, consecutive 120 months' imprisonment for Count Seven. The Probation Officer based Hollis's 720-month guidelines calculation on an adjusted total-offense level of 43 (adjusted from total-offense level 46 under U.S.S.G. Chapter 5, Part A cmt. 2) and a criminal history category of IV. PSR ¶¶ 94–97. The applicable period of supervised release is five years to life for Count One and a maximum of three years for Count Seven. PSR ¶ 99. The United States has no remaining factual or legal objections to the report. Hollis appears to maintain one objection to the guideline

calculation's inclusion of the vulnerable-victim enhancement, which we address below. The United States asks this Court to adopt the recommended guideline range.

### III.      Argument for a 60-year sentence

Hollis's conduct, taken with the sentencing factors set forth in 18 U.S.C. § 3553(a), demands a guidelines sentence of 60 years' imprisonment. Hollis is a repeat sex offender who targeted and sexually abused two young children in his custody and care. He poses an extraordinary danger to children in the community and that danger is unlikely to abate over time. This Court should impose the maximum sentence possible—a guidelines sentence of 60 years.

Although this Court may not presume that a guidelines sentence is reasonable, the guidelines remain a significant and pivotal component of the sentencing process. *United States v. Delva*, 922 F.3d 1228, 1257 (11th Cir. 2019); *United States v. Hunt*, 526 F.3d 739, 746 (11th Cir. 2008) ("[W]hile we do not presume that a sentence falling within the guidelines range is reasonable, we ordinarily expect it to be so."). This Court therefore "must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual defendant in light of the statutory sentencing factors, 18 U.S.C. § 3553(a), explaining any variance from the former with reference to the latter." *Nelson v. United States*, 129 S. Ct. 890, 891-92 (2009).

Section 3553(a)(1) provides that, in determining a sentence, this Court must consider the nature and circumstances of the offense, as well as the history and characteristics of the defendant. Additional factors outlined in section 3553(a)(2) include the need for the sentence to reflect the seriousness of the offense; to promote

respect for the law; to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed education or vocational training, medical care, or other corrective treatment in the most effective manner. 18 U.S.C. § 3553(a)(2). Consideration of these factors necessitates a 60-year sentence.

### A.   Nature and circumstances of the offenses

The nature and circumstances of Hollis's offenses are abhorrent. Hollis, already a convicted sex offender, targeted a special-needs child in his custody, groomed her for long-term sexual abuse, abused her, and advertised and distributed her pornographic images on the internet. He also added that content to his child pornography collection, which primarily consisted of material involving other young children. Moreover, as part of the same scheme, Hollis groomed and sexually battered a second child in his custody and care.

1.   Hollis produced child pornography of, and inflicted violent sexual abuse upon, a special-needs child in his custody and care

Hollis created five child-pornographic photographs of K.T. Doc. 37 at 24. The images depict Hollis pulling up K.T.'s "Tinker Bell" pajama top to just below her breasts and pulling down her pants to expose her genital area, which was the focus of the produced images. Doc. 37 at 24. But Hollis's abuse of K.T. did not end with taking lewd photographs of her genitals. During the encounter, Hollis also molested K.T. K.T. reported that Hollis pulled down her pajama bottoms and wiped her buttocks with his hand. PSR ¶¶ 27, 60. She added that he also inserted his entire

hand and all five of his fingers into her vagina, causing her pain. PSR ¶¶ 27, 60. Moreover, if Hollis's admissions to others are credited, he engaged in even more serious sex acts with her on other occasions. In an online conversation from January 2013, Hollis told another individual that he had started abusing K.T. when she was five-years old and that the abuse was ongoing. Ex. A. Hollis provided specific details, stating: "[s]he stroked my cock while I played with her pussy…she likes it when I rub her clit…I'm gonna try to get more pics this weekend." Ex. A. When asked how he convinced seven-year old K.T. to have sex with him, Hollis responded: "[l]et her watch porn with me[.]" Ex. A. What is more, K.T.'s victim-impact statement accuses Hollis of "rape" and expresses regret for "giving herself" to him when she was "just a baby."[1] Ex B.

Beyond the sexual violence that Hollis inflicted on K.T., two additional aspects of his abuse are particularly egregious. First, as detailed throughout the Presentence Investigation Report, K.T. was in Hollis's custody and care by virtue of a familial relationship. PSR ¶ 27. Second, K.T. is deaf. As a result, she has difficulty speaking and communicates primarily through sign language. PSR ¶ 27.

Despite K.T.'s disability, Hollis objects to the Probation Officer's application of the vulnerable victim enhancement under U.S.S.G. §3A1.1(b)(1). Doc. 46 at 189. He asserts that the enhancement is inapplicable because (1) Hollis never believed that

---

[1] When originally interviewed by forensic examiners, K.T. denied that sexual intercourse had occurred. But in her victim-impact statement, she used the term "rape" several times, expressed regret for giving herself to Hollis, and implied that his abuse occurred on multiple occasions. *See* Ex. B.

the victim's hearing impairment made her more vulnerable to sexual abuse than other children, and (2) Hollis did not choose K.T. specifically because of her hearing impairment. Doc. 46 at 189. Hollis's arguments are without merit.

Section 3A1.1(b)(1) provides for a two-level increase "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim." U.S.S.G. §3A1.1(b)(1). A "vulnerable victim" is "a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. §3A1.1, cmt. n.2. The enhancement only applies when the defendant selects his victim due to the defendant's perception of the victim's vulnerability to the offense. *E.g.*, *United States v. Day*, 405 F.3d 1293, 1296 (11th Cir. 2005); *United States v. Malone*, 78 F.3d 518, 522 (11th Cir. 1996). The enhancement should not be scored if the vulnerability factor is already incorporated into the offense guideline.[2] U.S.S.G. §3A1.1, cmt. n.2. Ultimately, the enhancement's applicability is a fact-intensive inquiry made on a case-by-case basis. *United States v. Frank*, 247 F.3d 1257, 1260 (11th Cir. 2001).

Contrary to Hollis's objection, the guideline does not require the United States to prove that Hollis subjectively believed that K.T. was more vulnerable to abuse

---

[2] For this reason, we do not argue that K.T. or S.T. were vulnerable victims under section 3A1.1(b) because of their young age or living arrangement stemming from their legal and familial relationship to Hollis. *See* PSR ¶¶ 40, 43.

than all other children, or even that she was more vulnerable than her sibling. Nor does the guideline require that the vulnerability be the sole reason the defendant selects the victim. It merely requires the United States to establish by a preponderance of evidence that: (1) K.T. and/or S.T. were victims of the offense of conviction or relevant conduct; (2) K.T. and/or S.T. were particularly susceptible to the conduct; (3) Hollis knew or should have known of K.T. and/or S.T.'s unique vulnerability; and (4) Hollis purposely targeted K.T. and/or S.T. because of that vulnerability.

The facts of this case satisfy section 3A1.1(b). First, K.T. is indisputably a victim of the offense of conviction. Moreover, J.H. was victimized by Hollis's offense conduct and, as detailed below, S.T. is a victim of his relevant conduct.

Second, K.T. was particularly susceptible to Hollis's offense conduct on two, independent grounds. As detailed above, K.T. is deaf and primarily communicates through sign language. Naturally, a deaf child who can communicate only with a limited number of people she encounters will have more difficultly reporting sexual abuse. *Cf. United States v. Monsalve*, 342 F. App'x 451, 457-58 (11th Cir. 2009) (affirming enhancement where illegal alien victims had language barriers, as well as no legal status and were thus unlikely to report crime). K.T. and S.T. were also uniquely vulnerable because J.H. was a recovering addict who had already lost custody of them. *See* Ex. E; Ex. F. Turning to section 3A1.1(b)'s knowledge requirement, Hollis was acutely aware of K.T.'s hearing disability and had actual knowledge of J.H.'s struggles with addiction and related child-custody proceedings.

7

Finally, by a preponderance of evidence, Hollis selected K.T. and S.T. for the offense and relevant conduct precisely because of the above-mentioned vulnerabilities. Although Hollis abused both victims, he only appears to have used K.T. to produce child pornography.[3] In addition, Hollis purposely preyed on K.T. and S.T. because he knew they hailed from a troubled home and were being raised by a recovering, single parent. *Cf. United States v. Lowe*, 763 F. App'x 878, 879 (11th Cir. 2019) (affirming enhancement where victim hailed from dysfunctional home, had a drug-addicted mother, had little parental supervision, and had no income or means of transportation). As detailed below in subsection 3., Hollis exploited this vulnerability by targeting the family and telling the victims that revealing his abuse would result in them once again being separated from their mother. The evidence satisfies section 3A1.1(b)(1)'s conditions and this Court should overrule Hollis's objection.

   2.   Hollis simultaneously abused a second child in his custody and care

Hollis's exploitation of K.T. was part of a broader scheme to use and abuse multiple minors in his custody and care. In addition to the sexual abuse of K.T. detailed above, the evidence strongly suggests that Hollis abused K.T.'s relative, S.T. S.T. reported that Hollis began molesting her when she was around eight-years old. The first time, Hollis told S.T. to sit down on a bed, reached under her underwear,

---

[3] S.T. denied knowledge of Hollis taking pornographic photographs of her and, although Hollis advertised S.T. along with K.T., our investigation did not recover sexually explicit material of her.

and rubbed and fingered her vagina. Hollis repeated the same conduct on more than five occasions. During the period of Hollis's abuse and on roughly 15 separate occasions, he also made S.T. watch pornography with him.

S.T.'s claim that Hollis sexually abused her is corroborated by Hollis's internet communications. In a recovered January 2013 conversation where Hollis discussed his abusing K.T. and trading five pornographic images of her, an individual pivots to inquire about another minor, asking Hollis: "how about that chubby one did you fuck her?" Ex. A. Hollis responded: "Yes I have :) we still play, too." Ex. A. In an email exchange with a different person, Hollis stated: "I don't have any nudes of the 9yo yet, but I have some pussy pics of her sister." Ex. C at 2. In yet another conversation, Hollis wrote: "I have a few 'good' pics of her sister, too, that I can't post to imgsrc." Ex. C at 9.

The site mentioned by Hollis—"imgsrc"—is a Russian website named ImageSource that is used for photo hosting and sharing. A review of that website revealed two profiles named "arock172435" and "atomizer," both of which were associated with Hollis's email addresses (arock172435@gmail.com and atomizer511@gmail.com). Ex. D. The profile images for both accounts contained child-pornographic images. *See* Ex. D. The profile for "arock172435" read: "trade hc for vids. Prefer girls 5-11." Ex. D. The profile for "atomizer" read: "Have 2 [familial relationship between Hollis, S.T. and K.T.], 7yo & 9yo. Both like to play." Ex. D.

3. <u>Hollis's crime was likely not a crime of opportunity</u>

The facts of this case strongly suggest that Hollis's conduct was not merely opportunistic, but rather part of a premeditated effort to gain access to young children through marriage. Around 2011, J.H. was living in a half-way house and recovering from a serious drug addiction that had resulted in her losing custody of K.T. and S.T. Hollis, recently released from prison, met J.H. at a fast-food restaurant where they both worked. Despite J.H.'s many issues, Hollis began dating J.H. and married her in June 2011. Hollis knew that J.H. was attempting to regain custody of her children and he actively participated in that effort.

Hollis has recently claimed that he had fully disclosed his background to J.H. He told the Probation Officer: "My wife's family took me in since my family is not big and not close to one another. My wife's family was aware of my background and overlooked it. I convinced them and myself that I had changed." PSR ¶ 36. Not so. As detailed in the victim impact statements, Hollis materially misrepresented his background. Ex. E; Ex. F. He fed J.H. and other family members a false narrative about his sex offender status; claiming that it followed from an overly zealous prosecution of his receiving pictures from a 16-year-old girl when he was in his early 20s and redistributing them to his friends. To explain the police reports and interview transcript referencing prepubescent child pornography, Hollis fibbed that he was so vigorously interrogated that he surrendered and agreed with whatever the interviewers alleged. Despite Hollis's involvement in J.H.'s custody battle and their joint effort to gain permission for Hollis to have access to her children—which

included Hollis meeting with a psychologist—he never disclosed to J.H. his persistent pedophilic urges.

After seducing J.H. and winning her family's favor through falsehoods, Hollis turned to his primary objective—grooming K.T. and S.T. for long-term sexual abuse. He wasted no time. Although the offense conduct occurred in January 2013 (one-and-a-half years after marriage), the evidence suggests that Hollis began abusing K.T. in 2011 (at the age of five) and S.T. in 2012 (at the age of eight). *See* Ex. A. He secretly groomed the victims, showing them pornography and exposing them to his unclothed genitals. Ex. A. To ensure that the victims did not report his abuse, Hollis sewed fear into their minds by threatening them, by threatening harm to their mother, and by telling them that they would be taken from their mother if they disclosed the abuse to others. *See* Ex. E; Ex. F; Ex. G. Although it is impossible to know with certainty Hollis's true intent, the evidence strongly suggests that Hollis purposely targeted and married J.H. for access to her young children.

    4.  Hollis advertised K.T. and S.T. to feed his child pornography habit

Hollis actively advertised child-pornographic content of K.T. and S.T. with an aim toward obtaining new content for himself. As detailed above, he used multiple platforms to do so. For example, one post from motherless.com reads: "I confess that my little [familial relationship] and I have a touchy-feely good time when mommy is at work! Wanna know/see more? atomizer511@gmail.com."[4] Ex. H.

---

[4] Motherless.com is a website used to discuss taboo sex topics. It is known by law enforcement to be a popular forum where child exploitative material is shared and discussed.

Hollis's efforts proved successful. His devices contained over 250 images and more than 80 videos depicting child pornography. The files almost exclusively depicted very young girls and included depictions of sadomasochistic conduct. Doc. 37 at 25.

### 5. Hollis violated his sex-offender requirements and lied to law-enforcement

During the offense conduct, Hollis was violating his sex-offender-registration requirements in multiple ways. As detailed in Hollis's Presentence Investigation Report, he was convicted in 2000 for directing/promoting the sexual performance of a child, in violation of Fla. Stat. § 827.071. PSR ¶ 58. As a result, Hollis was required to register as a sex offender. As a registered sex offender, he had corresponding obligations with respect to internet usage and registration requirements for internet accounts. Hollis violated them.

In April 2013, law-enforcement officers visited Hollis at his place of employment. Hollis admitted that he had used his cell phone to access the internet and further admitted that he had failed to register two email addresses and a Facebook account, as required by law. PSR ¶ 59. Hollis also falsely denied having used any other email accounts, specifically denying the "arock2584" email address utilized in the offense conduct. *See* PSR ¶ 21. Hollis later pleaded guilty to failing to register as a sex offender. PSR ¶ 59.

### 6. Hollis's offense conduct warrants a 60-year sentence

The seriousness and duration of Hollis's offense conduct demonstrate the necessity of a guidelines sentence of 60 years. Hollis did not suffer from a solitary

lapse in judgment. His conduct was calculated and premeditated. For what appears to have been years, he deliberately and consistently elected to groom and sexually abuse two children in his care—broadcasting the abuse to feed his incessant need for new child-pornographic material.

The Eleventh Circuit Court of Appeals has affirmed life and natural-life sentences for conduct reaching similar levels of depravity. In *United States v. Irey*, the Eleventh Circuit overturned a 17.5-year sentence and essentially imposed the statutory maximum punishment for a middle-aged defendant who had traveled abroad and had recorded himself sexually abusing multiple, vulnerable children. 612 F.3d 1160, 1225 (11th Cir. 2010) (en banc). In another example, *United States v. Huskey*, the Eleventh Circuit affirmed a 70-year sentence for a defendant who, beginning when his daughter was six-years old and continuing for three years, engaged in anal, oral, and vaginal sex with her, also penetrating her with objects. 349 F. App'x 495, 496 (11th Cir. 2009). Like Hollis, Huskey (who scored as a criminal history category I) recorded the sexual abuse and distributed the pornography he created on the internet. *See id*. *Huskey* is merely one example of the Eleventh Circuit rejecting reasonableness challenges to life and natural life sentences for conduct resembling Hollis's. *See, e.g.*, *United States v. Foster*, 209 Fed. Appx. 942 (11th Cir. 2006) (affirming life sentence for defendant with criminal history category I, who during a 4-year period engaged in oral and vaginal sex with a single victim, his daughter, who was less than 12-years old when the abuse began).

Indeed, the Eleventh Circuit has consistently upheld life and natural life sentences for acts that, although still egregious, are arguably less egregious than Hollis's conduct. For example, in *United States v. Sarras*, the Eleventh Circuit affirmed as substantively reasonable a 100-year sentence where the defendant had several sexual encounters with a single 13-year old girl for roughly one year and took explicit photographs of her. *See* 575 F.3d 1191, 1220 (11th Cir. 2009). In *United States v. Johnson*, the Eleventh Circuit upheld as reasonable a 140–year sentence where the defendant, with a criminal history category of I, abused and photographed three boys—Victim 1, from 8–15 years old, Victim 2, from 14–16 years old, and Victim 3, from 13–14 years old. *See* 451 F.3d 1239, 1244 (11th Cir. 2006); *see also United States v. Kapordelis*, 569 F.3d 1291, 1318–19 (11th Cir. 2009) (upholding as reasonable a 420-month sentence, which represented an upward variance, where defendant engaged in a pattern over many years of molesting young teenaged boys and taking photographs of them).

In most cases, the Eleventh Circuit has "treated sex offenses as serious crimes, upholding severe sentences…" *United States v. Pugh*, 515 F.3d 1179, 1202 (11th Cir. 2008). The Eleventh Circuit is not alone in that regard. Nor is this Circuit alone in upholding life and natural life sentences for conduct comparable to Hollis's crimes. For example, in *United States v. Betcher*, the Eighth Circuit Court of Appeals upheld as reasonable a 750-year sentence for a first-time offender who had taken pornographic pictures of five girls, their ages ranging from eight to 11, including two of his granddaughters. 534 F.3d 820, 827-28 (8th Cir. 2008). Likewise, in *United States v.*

14

*Vowell*, the Sixth Circuit Court of Appeals upheld a 65-year sentence for a 40-year-old man who had sexual intercourse with his girlfriend's 8-year-old daughter, while being videotaped by his girlfriend. 516 F.3d 503, 511-13 (6th Cir. 2008). Additional extra-circuit illustrations abound. *See, e.g. United States v. Brown*, 843 F.3d 74, 75 (2d Cir. 2016) (upholding 60-year sentence for defendant who produced child pornography of at least five children, including an infant); *United States v. Horton*, 770 F.3d 582, 583 (7th Cir. 2014) (affirming 90-year sentence for defendant who, over a one-month period, created 37 videos of himself engaged in sexual conduct with three male students).

This Court has also imposed natural life sentences for conduct analogous to Hollis's crimes. In *United States v. Lockhart*, this Court sentenced Lockhart to a guidelines sentence of 70-years' imprisonment for producing and distributing child-pornographic content of his one-year-old relative. Case No. 8:19-cr-128-T-23AAS, Docs. 53, 62. Like Hollis, Lockhart sexually abused his relative while producing child pornography of her. Case No. 8:19-cr-128-T-23AAS, Docs. 53, 62. Unlike Hollis, Lockhart was not a repeat sex offender and had no criminal history. Case No. 8:19-cr-128-T-23AAS, Doc. 55 at 12.

Although this Court must consider other factors beyond Hollis's offense conduct, this Court should nonetheless give significant weight to his offense conduct in crafting his sentence here. *See, e.g.*, *United States v. Croteau*, 819 F.3d 1293, 1309 (11th Cir. 2016) ("The weight given to any specific § 3553(a) factor is committed to the sound discretion of the district court."). By abusing and creating child

pornography of a special-needs child in his custody and care, Hollis has likely wreaked upon her a lifetime of emotional damage. The same is true of S.T. By distributing the content depicting K.T. on the internet, he has exposed her to a lifetime of humiliation. He also has exposed the victims' mother, brothers, and extended family to a lifetime of torment and sadness. A sentence that essentially amounts to a lifetime for Hollis is therefore a just sentence.

### B.    History and characteristics of the defendant

Hollis's history and characteristics also weigh strongly in favor of a guidelines sentence. The U.S. Probation Office has concluded that Hollis's history and characteristics do not warrant a downward departure or downward variance. *See* PSR ¶¶ 114–116. We agree.

1. Hollis is a recidivist sex offender with deep-rooted, deviant interests

Nothing in Hollis's background supports a downward variance from a guidelines sentence. If anything, his history and characteristics reveal aggravating factors. Hollis is a recidivist sex offender with a strong, unabating, and deep-rooted sexual interest in children. As detailed above, his criminal history stretches as far back as 2000, when he was convicted for collecting child pornography and distributing at least 40 such images (depicting children under the age of 10) over America Online. PSR ¶ 57. Hollis was sentenced to four years imprisonment. PSR ¶ 57. In 2007, he violated his probation by having unsupervised contact with a minor and served additional time in prison for that violation. PSR ¶ 57. In 2013, he pleaded guilty to having failed to properly register as a sex offender and for having sexually

16

battered K.T. PSR ¶¶ 59–60. And, in 2014, he was charged with sexual battery on a different minor, S.T., with showing her obscene material, and for having violated a domestic violence injunction. PSR ¶ 63.

Hollis's troubling history appears to primarily stem from an uncontrolled sexual interest in prepubescent minors. Hollis has openly admitted that preference on multiple occasions. In 2000, he told law-enforcement officers that he has an abnormal attraction to girls aged 5-to-10-years old. Over a decade later, in an email recovered from March 2013, Hollis stated: "I like girls 4-11." Ex. C at 10. His hard-wired, prurient interests continue to this day. *See* PSR ¶ 36.

More troubling, Hollis's criminal history clearly indicates that he is simply unable to control those desires. His recovered web history, containing incessant searches for child pornography and incest, serves as further proof. Ex. I. In his own words:

> When it comes to the porn issue, it is something that I have always struggled with. I felt myself going down that road, looking at things that I should not have been looking at and I would tell myself not to do it, then I would delete everything off my phone, but I would be back at it within a few weeks…

PSR ¶ 36.

2. Other personal history and characteristics

Looking beyond Hollis's history as a recidivist sex offender, nothing in his personal history or characteristics supports a downward variance. Hollis's Presentence Investigation Report does not reveal anything remarkable about his childhood or adult life that could explain his offense conduct. Despite some financial

challenges and poor father figures, Hollis's upbringing appears to have been normal. He reported having a blissfully poor and "happy" childhood. PSR ¶ 69. He was not physically, emotionally or sexually abused. PSR ¶ 69.

Nor is this a case involving a defendant with a lower IQ or other mental, emotional, or social disabilities. Despite the depravity of his offense conduct, Hollis has no history of mental illness or emotional problems besides a 2008 diagnosis for depression that he treated with medication for two years. PSR ¶ 83. He earned a high school degree and has shown an ability to maintain steady employment. PSR ¶¶ 89, 92. Outside of his deviant sexual interests, Hollis is an ordinary person who has not suffered from mental disabilities or extreme life traumas that might help explain his crimes. This Court should impose a guidelines sentence.

### C.    Seriousness of the crime, promoting respect for the law, and the need for just punishment

"Retribution is a valid penological goal." *Glossip v. Gross*, 135 S. Ct. 2726, 2769 (2015) (Scalia, J. concurring). As the Eleventh Circuit explained in *Irey*: "the greater the harm the more serious the crime, and the longer the sentence should be for the punishment to fit the crime." 612 F.3d at 1206. Punishment is the way in which society expresses denunciation of wrongdoing, and it is thus essential that this Court promote and maintain respect for the law by pronouncing sentences that fully reflect society's revulsion. *See Gregg v. Georgia*, 428 U.S. 153, 184 n. 30 (1976) (citing Royal Commission on Capital Punishment, Minutes of Evidence, Dec. 1, 1949, p. 207 (1950)). In the same vein, Congress has expounded that the "just deserts" concept in

sentencing is a means of reflecting the "gravity of the defendant's conduct," as well as the "harm done or threatened by the offense."  S.Rep. No. 98-225, at 75-76, 1984 U.S.C.C.A.N. 3258-59.

"Child sex crimes are among the most egregious and despicable of societal and criminal offenses…" *Sarras*, 575 F.3d at 1220 (discussing how courts have upheld lengthy sentences in cases involving child sex crimes as substantively reasonable). Here, the seriousness of the crimes, taken with the need for just punishment and the goal of promoting respect for the law, weigh heavily in favor of a guidelines sentence.

1.  Promoting respect for the law and just punishment

This Court's sentence must reflect the need to "promote respect for the law." 18 U.S.C. § 3353(a)(2)(A). When Congress passed the Protection of Children against Sexual Exploitation Act of 1977, it sought to address the organized, nationwide child pornography industry that was generating millions of dollars through the exploitation of children. S. REP. 95-438, 5, 1978 U.S.C.C.A.N. 40, 42-43. The Act, which included 18 U.S.C. § 2251, was aimed at filling a void in federal law by targeting the production of materials depicting child abuse. S. REP. 95-438, 5, 1978 U.S.C.C.A.N. at 56. But the Act, and its later amendments, are more than prophylactic measures. They reflect value judgments and accepted moral norms of our society. As one Senate Judiciary Committee report concluded: "the use of children…as the subjects of pornographic materials is very harmful to both the children and the society as a whole," describing the conduct as "outrageous." S.

REP. 95-438, 5, 1978 U.S.C.C.A.N. at 43. Indeed, child sexual abuse "is grossly intrusive in the lives of children and is harmful to their normal psychological, emotional and sexual development in ways which no just or humane society can tolerate." *See Kennedy v. Louisiana*, 554 U.S. 407, 468 ((Alito J., joined by Roberts, C.J., Scalia, and Thomas, JJ., dissenting) (quoting C. Bagley & K. King, Child Sexual Abuse: The Search for Healing 2 (1990)).

Hollis's actions violated federal law, but they also transgressed accepted social norms that undergird our laws. His conduct was unnatural, morally repugnant and incompatible with a well-ordered society. Not only did Hollis violate section 2251 in one of the most depraved ways imaginable—he flaunted that conduct for the rest of the world to see. This Court's sentence must express an appropriate level of social condemnation of his crimes. A downward variance does not achieve that end.

2.  Impact on the victims

It is axiomatic that hands-on sexual abuse inflicts upon its victim enormous, devastating, and long-lasting harm. That the abuse is inflicted on a child adds a devastating dimension to the harm ordinarily inflicted on rape victims. As the Supreme Court explained while addressing an Eight Amendment challenge to capital punishment for the rape of a child by her stepfather in *Kennedy v. Louisiana*:

> […] the victim's fright, the sense of betrayal, and the nature of her injuries caused more prolonged physical and mental suffering than, say, a sudden killing by an unseen assassin. The attack was not just on her but on her childhood.... Rape has a permanent psychological, emotional, and sometimes physical impact on the child. We cannot dismiss the years of long anguish that must be endured by the victim of child rape.

554 U.S. at 435 (citing various studies). Those years of anguish can include sudden school failure, unprovoked crying, dissociation, depression, insomnia, sleep disturbances, nightmares, feelings of guilt and inferiority, and self-destructive behavior, including an increased incidence of suicide. *Id.* at 468 ((Alito J., joined by Roberts, C.J., Scalia, and Thomas, JJ., dissenting). Sexually exploited children also struggle to develop healthy affectionate relationships, suffer from sexual dysfunctions, and tend to become sexual abusers themselves. *See New York v. Ferber*, 458 U.S. 747, 758 n. 9 (1982) (citation omitted). And this is to say nothing of the serious and sometimes long-lasting physical injuries that hands-on sex abuse can inflict on a child victim, such as internal lacerations, scarring, ovary damage, and encopresis. *See Irey*, 612 F.3d at 1207 (collecting cases).

Hollis's victims had barely experienced five years of life before Hollis destroyed any possibility of their lives ever being normal. They will no doubt suffer long-term physical and psychological trauma from his crimes. Indeed, their victim-impact statements suggest that that trauma has already taken root. K.T. expressed self-hate, cluelessness, anger and intense fear that will last "for the rest of [her] life." Ex. B. She is already struggling to form functional friendships and normal relationships with men. Ex. B. Her schooling has also been affected, as evidenced by her heartbreaking story of an emotional breakdown in class. Ex. B. As K.T. is well-aware, she will forever live in a world where images of her prepubescent genitals live on in perpetuity on the internet. What is more, another family member shared that

K.T. has engaged in self-harm, suffered from suicidal ideation, and has been overly affectionate with men. Ex. F.

S.T. described a ruined family and nightmarish childhood poisoned by the lingering fear of the next abuse. Ex. G. She also recounted her horrifying memory of being afraid to fall asleep because she did not want to wake up to Hollis's molestations. Ex. G. S.T., too, expressed an inability to trust men or even be alone with a male "without [her] heart racing like it's beating out of [her] chest." Ex. G.

Hollis's abuse of the victims also, in turn, victimized their mother, J.H., as well as their extended family. Their mother and other family members will have to live with more than the awful memory and knowledge that their daughters had been sexually abused by a fellow family member. J.H.'s impact statement expresses personal regret, disbelief, humiliation, self-blame, a loss of self-respect and a deep sense of guilt for Hollis's conduct. Ex. E. His crimes also contributed to J.H.'s relapse into a serious drug addiction that, once again, resulted in the victims' traumatic removal from J.H.'s custody. Ex. E. Another family member detailed the victims witnessing their mother's total collapse, as she succumbed to drug addiction and emotional anguish stemming from Hollis's conduct. Ex. F. J.H. and her family will also be burdened for many years with the decision of whether to fully inform Hollis's young son, how to tell him, and how that knowledge might affect his life. *See* Ex. E; Ex. F.

In addition to the victims of Hollis's hands-on abuse, his graphic child pornography collection revictimized countless other children. Hollis consumed large

amounts of media depicting child sex abuse with no regard to the broken lives depicted in the images and videos that he so willingly shared and helped create. As the Supreme Court has recognized, "[t]he distribution of photographs and films depicting sexual activity by juveniles is intrinsically related to the sexual abuse of children .... [T]he materials produced are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation..." *Ferber*, 458 U.S. at 758–59 nn. 9–10 (citations omitted). A guidelines sentence of 60-years' imprisonment is necessary to recognize the victims harmed by Hollis's conduct and to restore public confidence in our laws protecting children.

### D.    Adequate deterrence and the need to protect the public

Deterrence is especially important for crimes involving the sexual abuse of children, including child pornography. *See United States v. Goldberg*, 491 F.3d 668 (7th Cir. 2007). "Sentences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor." *See id*.

The Supreme Court has noted "grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class..." *Smith v. Doe*, 538 U.S. 84, 103 (2003). Hollis fits well-within that class. As this Circuit recognized in *Irey*, research in this field is "consistent with what judicial decisions show: pedophiles who have sexually abused children are a threat to continue doing so, and age does not remove the threat." 612 F.3d at 1214 (citing various studies and reports); *see also Pugh*, 515 F.3d at 1201 ("sex offenders have appalling rates of recidivism and their crimes are under-reported."); *United States v. Allison*, 447 F.3d

402, 405–06 (5th Cir. 2006) ("Congress explicitly recognized the high rate of recidivism in convicted sex offenders, especially child sex offenders."). Hollis's multi-decade pattern of sexually exploitative conduct toward children evidences a high probability of recidivism if this Court allows him the chance to reenter society. A strong need thus exists to protect children in the community from Hollis—now and well into the future.

Three factors combine to make Hollis an extraordinary danger to the community now and decades from now. First, Hollis suffers from a deeply entrenched and unshakable sexual interest in prepubescent children as young as four-years old. For decades, Hollis has derived sexual gratification from watching the abuse of society's most vulnerable children—children under 10-years old who are physically unable to resist and unlikely to report abuse. This, in turn, suggests that Hollis's abuse of the victims was, at least in part, motivated by pedophilia. Second, Hollis—whether driven by pedophilic urges, a need for status, or some combination thereof—was brazen enough to seek out and repeatedly abuse not just any child, but children in his own family. Finally, and perhaps most importantly, Hollis's ingrained, pedophilic desires are immune to punitive deterrence. Before Hollis's abuse of K.T. and S.T., he had twice been sentenced to significant terms of imprisonment for child-exploitative crimes and for violating his probation through

unsupervised contact with a minor.[5] PSR ¶ 57. Only a few years passed between his June 2008 release from prison and the offense conduct. *Compare* PSR ¶ 57 *with* PSR ¶ 59.

Considered together, these three factors suggest that Hollis poses an enormous risk not only to other children in the community, but to his own kin as well. A guidelines sentence of 60 years denies Hollis the opportunity to victimize other children in the community. A 60-year sentence also ensures that if Hollis is ever released from prison, he will most likely be too old to father additional children to abuse.

This Court should also impose a 60-year sentence to send a strong warning to other individuals currently involved in or considering similar conduct—especially those who may have been inspired by Hollis's child-exploitative advertisements and content. *See Irey*, 612 F.3d at 1208 ("There is another aspect of the compounding harm that the production and distribution of child pornography inflicts. It may incite or encourage others to sexually abuse children."). A 60-year sentence signals to parents and relatives inclined to sexually abuse vulnerable children, as well as individuals inclined to court single parents in order to gain access to their children, that such behavior is abhorrent and will be punished harshly.

---

[5] The United States in not familiar with the circumstances surrounding Hollis's probation violation for unsupervised contact with a minor. The Presentence Investigation Report does not provide additional details. PSR ¶ 57.

## IV. <u>Conclusion</u>

This Court should sentence Hollis to a guidelines sentence of 60 years' imprisonment. Nothing in the offense conduct or Hollis's history and characteristics warrants a downward departure or variance. A guidelines sentence of 60 years' imprisonment is the only reasonable sentence because it is the only sentence that reflects the seriousness of Hollis's crimes, provides just punishment for those crimes, fully protects children in the community, and promotes respect for the law.

Respectfully submitted,

MARIA CHAPA LOPEZ
United States Attorney

By: */s/ Francis D. Murray*
Francis D. Murray
Assistant United States Attorney
Florida Bar No. 0108567
400 N. Tampa Street, Ste. 3200
Tampa, FL 33602
Phone: (813) 274-6000
Fax: (813) 274-6103
Email: francis.murray2@usdoj.gov

**U.S. v. Hollis**                    **Case No. 8:20-cr-84-T-23SPF**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 15, 2021, I electronically filed the

foregoing with the Clerk of the Court by using the CM/ECF system, which

will send a notice of electronic filing to the following:

Sara Lenore Mieczkowski, Esq.


*/s/ Francis D. Murray*
Francis D. Murray
Assistant United States Attorney
Florida Bar No. 0108567
400 N. Tampa Street, Ste. 3200
Tampa, FL 33602
Phone:  (813) 274-6000
Fax:    (813) 274-6103
Email: francis.murray2@usdoj.gov